Filed 4/22/21  In re I.A. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re I.A., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>SHERRY B.,<br><br>    Defendant and Appellant. | G059510<br><br>(Super. Ct. No. 17DP0238A)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Antony C. Ufland, Judge.  Affirmed.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant Sherry B.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

\*　　　\*　　　\*

This juvenile dependency case arose after Sherry B. (Mother) absconded with her young daughter, I.A., allegedly to protect the child from suspected sexual abuse by her presumed father, Jorge S.-A. (Father).  The juvenile court sustained the dependency petition and vested custody of I.A. with her paternal grandmother.  Reunification services were provided, and I.A. eventually was returned to Father's custody, with Mother having monitored visitation.  In the months that followed, Mother received ongoing enhancement services.  The court later terminated jurisdiction and issued exit orders which granted sole physical and legal custody of I.A. to Father and supervised visitation to Mother.

Mother appeals from the exit orders.  She asserts she was not provided reasonable services, the exit orders are arbitrary and not sufficiently specific, and the court violated the inquiry and notice requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C § 1901 et seq.).  We reject these contentions and affirm the orders.

## FACTS

Mother and Father met in 2011 and lived together for a short period of time.  They had a daughter, I.A., in May 2016.

Father has a limited criminal history that includes convictions for a hit and run and for driving without a license.  Mother has a history of substance abuse and a similar criminal history that includes loitering with the intent to engage in prostitution, multiple convictions of driving under the influence, and driving with a suspended license.  She also has suffered from a major depressive disorder and anxiety disorder; she takes medication to address her mental health issues.  Finally, Mother and Father have a history of domestic violence, which includes Mother hitting Father in late 2016 and early 2017.

2

1.    *The First Dependency Case*

In March 2017, I.A. (then only ten months old) sustained a serious burn on her arm.  Neither parent had a plausible explanation for her injury.  The Orange County Social Services Agency (Agency) filed a juvenile dependency petition (the first dependency case), citing concerns of neglect, domestic violence, substance abuse, and Mother's unresolved mental health condition.

The juvenile court in that case determined ICWA did not apply and sustained the petition.  I.A. was then removed from her parents' custody.

Six months later, the juvenile court ordered I.A. returned to Father's custody under a family maintenance case plan.  The court ordered Father to participate in counseling and parenting; Mother was ordered to participate in counseling, a parent education program, substance abuse testing, a substance abuse treatment program, and anger management classes.

Father completed his services, and in March 2018, dependency proceedings were terminated with exit orders for Father to have primary physical custody and Mother to have monitored visitation.

2.    *Events Leading to the Second Dependency Case*

As noted, the exit orders in the first dependency case required Mother's visits with I.A. to be supervised.  On occasion, however, Father let Mother visit I.A. unsupervised and even keep her for up to five days at a time.  According to Father, he did so because Mother threatened to report him to immigration services.

At some point in 2018, while changing a diaper, Mother noticed a red mark on I.A.'s vagina.  Mother also heard I.A. repeatedly say "chupale" (Spanish for "to suck") and "No more yucky papi."  Mother took I.A. into a library bathroom during one of their visits and asked her what "chupale" meant.  In response, I.A. started sucking on the bathroom faucet.  Mother then became concerned that Father was a pedophile and was sexually abusing I.A.

3

In November 2018, Father left I.A. (now age two) with Mother at a Chuck E. Cheese. The visit was unsupervised, in violation of the juvenile court's exit orders. When Father went to pick up I.A. that evening as planned, Mother and I.A. were gone.

Mother, allegedly afraid that Father was abusing I.A., fled with I.A. to Pennsylvania, where Mother's sisters live. Once they arrived, Mother called the Costa Mesa Police Department to tell them where they were; at that time, she also reported Father's alleged sexual abuse to police in Pennsylvania.

3. *The Petition in the Second Dependency Case*

The Agency filed a second juvenile dependency petition under Welfare and Institutions Code[1] section 300, subdivision (b)(1), alleging I.A. suffered, or there was substantial risk she would suffer, serious physical harm or illness as a result of her parents' failure or inability to supervise or protect her adequately and their inability to provide regular care for her due to mental illness, developmental disability, or substance abuse (the second dependency case). Among other allegations, the petition alleged Father had allowed Mother to have unmonitored contact with I.A. in violation of a juvenile court order, and the whereabouts of Mother and I.A. were unknown.

The juvenile court issued a warrant of arrest for Mother and I.A. It also found ICWA did not apply, relying in part on the finding in the first dependency case.

Law enforcement officers in Pennsylvania located Mother and I.A. in Pittsburg and took Mother into custody. I.A. was examined at a children's hospital; no indication of sexual abuse was found. The following week, I.A. flew back to California with an Orange County social worker and was placed with her paternal grandmother, Maria S.

Santa Ana police detectives elected not to do a CAST interview of I.A. concerning Father's alleged sexual abuse. Mother's sister sent them a video to support

---

[1] All further undesignated statutory references are to this code.

Mother's accusations, but the detectives determined Mother was leading the child in the video.

Mother was extradited to California. The Agency interviewed Mother in jail; Mother reiterated that she took I.A. out of state to protect her from Father's sexual abuse, asserting she did what "any mother would have done to protect her child." Mother also stated she did not feel she needed to complete services such as counseling or parenting classes, as she had completed them during the first dependency case. Around that same time, Mother accepted a plea deal in Pennsylvania that included pleading guilty to one count of felony child abduction; she was sentenced to three years formal probation with 150 days credit for time served.

In February 2019, at the jurisdictional hearing in the second dependency case, the juvenile court sustained the petition, finding the allegations true by a preponderance of the evidence. The court denied visitation with Mother, finding that visitation would be detrimental to I.A.

The next month, at the contested disposition hearing, the juvenile court declared I.A. a dependent of the court and vested custody with the Agency for suitable placement. It granted Father six hours of unmonitored visitation per week and Mother eight hours of monitored visitation per week; it also ordered family reunification services and set the matter for a six-month reunification review hearing. The court ordered Mother to participate in parenting classes, counseling, a domestic violence program, a 10-week anger management program, an alcohol treatment program, and random alcohol testing.

4. *Family Reunification Services*

In the months that followed, Mother completed a parenting education program; she enrolled in counseling but did not participate consistently; she attended six out of ten classes in her Personal Empowerment Program (PEP) on domestic violence; she started an anger management program at Casa de la Familia but was terminated in

5

July 2019 after she verbally threatened the group facilitator;[2] she had three "no shows" to drug testing; she tested negative in all other tests between April and July 2019.

That summer, I.A. (now age 3) was moved to a 60-day trial return to Father, and Mother continued her monitored visits with I.A. At first, I.A.'s paternal grandmother, Maria, monitored Mother's visits. When Mother engaged in "aggressive behaviors" toward Maria, the visits were moved to the CAST office and monitored by social worker staff.

Agency staff had no concerns about Mother's parenting during these visits and observed Mother interacting positively with I.A., but they also noted Mother was defensive and did not respond well to feedback. Consistent with that observation, Mother's therapist commented Mother was a "very devoted and a very loving mother," but she also said she shifted blame and did not show accountability for her actions.

In October 2019, during a monitored visit, I.A. disclosed to Mother that Father hit her "jayjay" with a "cinto" (Spanish for belt). Mother asked I.A. where Father hit her, and the child pointed to her vagina. Mother discreetly went to the bathroom and called 911 to report the incident.

I.A. was moved to Orangewood Children's Home, and then to her paternal grandmother's house, while Costa Mesa Police conducted a child abuse investigation. A social worker interviewed I.A., who reported Father hit her with a green "cinto" (belt)

---

[2] The counselors at Casa de la Familia told the social worker that Mother was "shy and introverted" during the first few anger management sessions. In response, Mother tried to speak up, but claims she was reprimanded as a result. During an anger management session two months later, Mother became defensive, demanded to see the facilitator's notes, and then told facilitator, "Well, just hope your kids are safe and this doesn't come back to you." Mother was terminated from the program as a result.

The social worker submitted a referral for another anger management program through Associates in Counseling and Meditation, but Mother never began the program. Mother enrolled in a different anger management program through ICNA Relief, but she never provided the Agency with proof of completion of that program.

and "chancla" (sandal) "because I don't listen." When asked if she was afraid of Father, she nodded her head yes. She said she did not want to return home to him, but then later said she wanted "to be with Sherry [Mother] and my papi." The social worker also interviewed Father, who was adamant he had not used physical discipline on the child and suspected Mother was influencing her to derail his reunification efforts. Father also denied owning a green belt or sandals.

The social worker ultimately determined Mother's allegations of abuse were unfounded, and in November 2019, I.A. was returned to Father to resume the 60-day trial visit.

Shortly thereafter, Mother saw Father at a visit and yelled profanities at him while I.A. was present. Her volatility caused the social worker to believe Mother was still a flight risk.

5. *The January 2020 Hearing*

At the January 2020 contested six-month review hearing, after receiving testimony from a social worker and Mother, the juvenile court found reasonable services had been provided, Mother had made moderate progress, and Father had made substantial progress. It ordered I.A. returned to Father, and it offered ongoing "enhanced services" to Mother, ordering her to participate in counseling and to be evaluated for medication. The court also increased Mother's visitation to ten hours per week, and it set a six-month family maintenance review hearing.

In issuing that ruling, the juvenile court explained its thinking: "This is all about impulse control. I see that in court. I can tell that from when Mom testifies, when she sits in the audience, there is an impulse control problem here and it's getting to the heart of that problem that is going to be the solution here." Citing concerns about "the potential for [another] abduction," the court worried Mother might "respond the same again in the future if something else occurred." The court added this: "Are there meds that Mom should be on? Are there meds that may assist with the impulsivity and anger

management and poor decision-making? . . . [¶] . . . I need her seeing somebody who can evaluate her for meds . . . . [¶ . . . ¶] . . . I want to get to the bottom of Mother's inability to control anger because that's what's going to allow her to be a safe part of I.A.'s life and without that, she's just not."

### 6. *Family Maintenance Services*

In the weeks that followed, a social worker reminded Mother that the juvenile court had asked her to participate in a psychological evaluation. Mother responded, "[N]o, I will not be doing that." She insisted the court did not require her to undergo a psychological evaluation and claimed "the judge told me I only have impulsivity." The social worker advised Mother to contact her attorney.

A month later, after several attempts to meet with Mother, the social worker finally spoke with her on the telephone to discuss her psychological evaluation. Mother responded, "At this point I'm not fighting anymore"; she stated she needed to catch the bus and then terminated the call. Five minutes later, however, Mother called back and said "she could not 'just give up.'"

Despite Mother's apparent new resolve, the psychological evaluation never occurred. The social worker mailed Mother a packet of resources on psychological evaluations; Mother did not respond. Mother was also a "no show" to her February, April, May, and June 2020 appointments with Advantage Neuropsychiatric Associates.

Around that same time, because of the COVID-19 pandemic, Mother's in-person visits with I.A. were suspended and modified to video chat and telephone calls. The contested six-month maintenance review hearing was continued by stipulation to August 2020.

That summer, the Agency filed a status review report relaying that Mother had "minimally participated in case plan services," "did not follow through with scheduled appointments," "did not provide authorization for the Agency to speak with all of her service providers," and had demonstrated only "minimal" cooperation with the

8

case plan. It further noted Mother failed to appear for her appointments with Advantage Neuropsychiatric Associates, had not participated in counseling during this period of supervision, had completed eight out of ten PEP sessions, and had provided no evidence of having completed an anger management program.

7.  *The August 2020 Hearing and Orders*

At the six-month family maintenance review hearing in August 2020, the social worker testified she recommended that Father receive sole custody over I.A. (now age 4) "due to the Mother's uncooperative participation in services and the Mother's current mental health." Mother, in contrast, testified that she had completed a parenting class, a drug program, a domestic violence class (PEP), an anger management class, and counseling sessions, and that she had been taking her medication daily. She also offered into evidence a certificate of completion of her PEP program.

Attorneys for the Agency, Father, and I.A. all asked the juvenile court to close the case and grant sole legal and physical custody to Father with monitored visits with Mother. Mother's counsel asked the court to keep the case open and to "keep some supervision on Father," citing ongoing concerns about his honesty.

After considering the evidence, the juvenile court decided to terminate jurisdiction. The court noted it was Father's ill-advised decision to allow Mother to have unsupervised contact with I.A. that allowed Mother to abscond with the child, and it found that was not likely to reoccur if the court terminated supervision. (See § 364, subd. (c).) The court then ordered sole physical and legal custody to Father, with supervised visitation for Mother at ten hours per week, citing its concerns about Mother's "state of mind" and noting Mother has "an agenda that is not in the child's best interest." The court also noted that if Mother got in the right "state of mind" at some point in the future, she could go to the family court and demonstrate a change of circumstances warranting a change of custody. As the court announced its ruling, Mother repeatedly

9

interrupted the court and cursed, and she was admonished by her counsel and the bailiff to be quiet.

The juvenile court issued exit orders that included a juvenile custody order and final judgment (Form JV-200) and a visitation order and attachment (Forms JV-205 and JV-206).

Mother filed a notice of appeal from the juvenile court's August 2020 findings and orders.

## DISCUSSION

1. *Reasonable Services*

Mother first contends the juvenile court erroneously found reasonable services had been provided to Mother. Before turning to Mother's arguments, we review the statutory authority on reunification services and enhancement services.

a. *Governing Principles*

"As a general rule, when a child is removed from parental custody under the dependency statutes, the juvenile court is required to provide reunification services pursuant to section 361.5 to 'the child and the child's mother and statutorily presumed father.' (§ 361.5, subd. (a).) The purpose of these reunification services is 'to facilitate the return of a dependent child to parental custody.' [Citations.] Unless an express exemption exists, reunification services provided pursuant to section 361.5 are mandatory, subject to strict timelines, and monitored through periodic court reviews at which parents are admonished that failure to participate successfully in reunification efforts could lead to the termination of their parental rights. (§§ 361.5, 366.21, 366.22.)" (*In re Jaden E.* (2014) 229 Cal.App.4th 1277, 1281.)

The child and parent are typically entitled to 12 months of reunification services, but those services may be extended up to 18 months if at the 12-month hearing the Agency does not prove, by clear and convincing evidence, that it has provided

10

reasonable services to the parent. (§§ 361.5, subd. (a), 366.21, subd. (g)(1); see *In re K.C.* (2012) 212 Cal.App.4th 323, 329 (*K.C.*).) "To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .'" (*In re M.F.* (2019) 32 Cal.App.5th 1, 14 (*M.F.*).)

"'[R]eunification' is the goal of a dependency case only when, as a result of the dependency action, the existing custodial relationship between a parent or guardian, and the child, has been disrupted." (*In re A.L.* (2010) 188 Cal.App.4th 138, 144 (*A.L.*).) When a child is not removed from his or her custodial parent in the dependency proceeding, "no 'reunification' services are called for." (*Id.* at p. 145.) Instead, the court, in its discretion, may order services aimed "to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." (§ 362, subd. (d).)

These services are commonly referred to in dependency jargon as "enhancement services" (*In re Destiny D.* (2017) 15 Cal.App.5th 197, 212 (*Destiny D.*)); they are not the same as reunification services. Enhancement services are a form of discretionary "'child welfare services offered to the parent not retaining custody, designed to enhance the child's relationship with that parent.'" (*Id.* at p. 212.) Unlike reunification services, enhancement services are "'"not designed to reunify the child with that parent, but instead to enhance the child's relationship with that parent by requiring that parent to address the issues that brought the child before the court."'" (*Id.* at pp. 212-213.) Unlike reunification services, enhancement services are not subject to strict timelines, periodic review, or mandatory extensions. (Compare § 362 with §§ 361.5, 366.21, subd. (g)(1).) And unlike reunification services, which are mandatory

and must be reasonable, enhancement services are wholly discretionary. (*Destiny D.,* at p. 213.) We therefore affirm an order on enhancement services unless the appellant demonstrates the order "was arbitrary, capricious or patently absurd." (*Ibid.*)

           b.     *Recap of Relevant Facts*

That brings us to the events of this case. According to the exit orders in the first dependency case, at the time Mother absconded with I.A. in November 2018, Father had sole custody over I.A.; Mother had monitored visitation.

At the March 2019 disposition hearing in the second dependency case, the juvenile court declared I.A. a dependent of the court, vested custody of I.A. with the Agency for suitable placement, and ordered reunification services, including that Mother complete an anger management program. Mother started an anger management program but was terminated after she verbally threatened the group facilitator.

At the six-month reunification review hearing in January 2020, the juvenile court found reasonable services had been provided and ordered I.A. returned to Father, thus marking the end of the reunification period and the beginning of family maintenance. Mother did not appeal that finding. The court also offered ongoing "enhanced services" (i.e., enhancement services) to Mother, including an updated psychological evaluation of her medication needs to address her impulsivity. Despite some efforts by the Agency, Mother never underwent that updated evaluation.

At the six-month maintenance review hearing in August 2020, the juvenile court terminated jurisdiction. Its exit orders specified Mother was afforded only supervised visitation because she had not completed or had not made substantial progress in a domestic violence program, anger management training, or counseling.

Mother contends the juvenile court "improperly found reasonable services had been provided," but as best we can tell, the court made no such finding in its August 2020 orders from which Mother appeals. Nor was the court required to make such a finding at that point in the proceedings; in conducting a periodic status review of a minor

12

who remains in the custody of her parent (in this case, Father), the court's task was to determine whether there is cause to continue court supervision and family maintenance services. (See § 364, subd. (c).)

Nevertheless, Mother maintains the juvenile court improperly found reasonable services were provided to her because the Agency (1) did not assist her with completing anger management or with finding an unbiased anger management program tailored to her specific cultural needs; (2) did not ensure Mother received an up-to-date evaluation of her medication needs; and (3) did not permit in-person visitation during the COVID-19 pandemic. As a result, Mother contends she was unable to meaningfully address the court's concerns, and the court should have granted her six additional months of services rather than terminating jurisdiction. We address each of these arguments in turn.

c. *The Anger Management Program*

Turning first to the Agency's failure to ensure Mother completed an anger management program, Mother asserts the Agency should have helped her find an unbiased anger management program tailored to her specific cultural needs. She contends the counselors at Casa de la Familia were primarily Latino and "not sensitive to her particular cultural needs" as a Black woman. Although Mother never asked for a culturally sensitive anger management program and never complained Casa de la Familia was culturally insensitive during the proceedings below, she insists on appeal "the need for [culturally sensitive] services should have become apparent to the Agency."

These arguments are untimely; they are therefore waived because the events Mother complains about took place during the prior review period. As noted, the juvenile court ordered Mother to participate in a 10-week anger management program in March 2019, and all of Mother's anger management sessions took place during the reunification period, which ended in January 2020 when the court found reasonable services had been provided and ordered I.A. returned to Father.

13

The time for appealing the court's reasonable services finding has expired. (See *In re T.G.* (2010) 188 Cal.App.4th 687, 696 [adverse reasonable services finding at the six-month review hearing is appealable]; *Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 259 ["under the so-called waiver rule, a parent may not attack the validity of a prior appealable order for which the statutory time for filing an appeal has passed"]; see, e.g., *In re Casey D.* (1999) 70 Cal.App.4th 38, 46 ["challenge to the termination of reunification services at the six-month review hearing is not timely . . . [because] [t]he time for appealing the orders made at the six-month review hearing has long since passed"].)  Mother therefore waived any arguments about the reasonableness of her anger management program.

  d.  *The Psychological Evaluation*

  Mother next contends reasonable services were not provided because the Agency did not help her undergo an updated psychological evaluation.  This argument fails for multiple reasons.

  To start, Mother confuses mandatory reunification services (see § 361.5) with discretionary enhancement services (see § 362).  When a child is removed from a parent's custody, the Agency must provide reasonable child welfare services, such as reunification services, to the parent and child under section 361.5.  But where, as here, the child is not removed from her custodial parent, "*no 'reunification' services are called for*.  Instead, as stated in section 362, the court in that situation is vested with discretion to make 'any and all reasonable orders to the parents or guardians of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out the provisions of this section.'"  (*A.L.*, *supra*, 188 Cal.App.4th at p. 145, italics added.)

  The psychological evaluation Mother complains was not done was not a mandatory reunification service offered during family reunification under section 361.5; it was a discretionary enhancement service offered during family maintenance under

section 362. That distinction is important. We are aware of no authority mandating the provision of enhancement services during family maintenance or requiring that such services be "reasonable," and Mother cites none. Indeed, nearly all the cases cited in Mother's opening brief concern mandatory reunification services under section 361.5, not enhancement services. (See, e.g., *M.F.*, *supra*, 32 Cal.App.5th at p. 14; *K.C.*, *supra*, 212 Cal.App.4th at p. 330.) Unlike reunification services, which are mandatory and which must be reasonable, "[a]n order for enhancement services is subject to the court's discretion." (*Destiny D.*, *supra*, 15 Cal.App.5th at p. 213.)

We find no abuse of discretion in the juvenile court's decision to terminate jurisdiction. As noted above, during the family maintenance period, the social worker reminded Mother that the juvenile court had asked her to participate in a psychological evaluation, and Mother responded she would not; the social worker mailed Mother a packet of resources on psychological evaluations, but Mother did not respond; and Mother was a "no show" to multiple appointments with Advantage Neuropsychiatric Associates. The Agency's efforts were reasonable under the circumstances, and the court was under no statutory obligation to keep the case open so the Agency could ensure Mother received the evaluation. Indeed, the court was required to terminate its jurisdiction after finding the conditions justifying its initial assumption of jurisdiction under section 300 (i.e., Father allowing Mother to have unmonitored visitation in violation of a court order) no longer existed. (§ 364, subd. (c).)

e.    *Visitation*

Mother contends she did not receive reasonable services because the Agency unnecessarily limited visitation to telephone calls during the COVID-19 pandemic. She asserts the juvenile court should have permitted in-person visits with proper safety precautions, like wearing masks and staying outdoors. We review visitation orders for abuse of discretion. (*In re Emmanuel R.* (2001) 94 Cal.App.4th 452, 465.)

15

We find no abuse of discretion here. Emergency Rule 6(c)(7) of the California Rules of Court authorized the Agency "to determine the manner of visitation to ensure that the needs of the family are met" and to make changes "on a case by case basis, balanc[ing] the public health directives and best interest of the child." In this case, the social worker testified I.A. was unable to follow the protocol for in-person visits, so shifting to telephonic and video visits, though perhaps not ideal, was reasonable under the circumstances. In any event, Mother forfeited this argument by failing to timely raise it below; Emergency Rule 6(c)(7)(B) required her to ask the juvenile court to review the change in visitation within 14 court days of the change, and she did not do so.

2. *Exit Orders*

Mother next contends the juvenile court abused its discretion in issuing its exit orders on custody and visitation. Again, we cannot agree.

Section 362.4 authorizes a juvenile court to issue exit orders for visitation and custody when terminating its jurisdiction in a dependency proceeding, and those orders remain in place even after jurisdiction is terminated. (§ 362.4, subd. (a), (b); see § 302, subd. (d).) A family court may later modify the section 362.4 exit orders, but only if it "finds that there has been a significant change of circumstances since the juvenile court issued the order and modification of the order is in the best interests of the child." (§ 302, subd. (d); see Fam. Code, § 3021.) We review section 362.4 exit orders for abuse of discretion, and we will not disturb the orders unless the juvenile court made an arbitrary, capricious, or patently absurd determination. (*In re M.R.* (2017) 7 Cal.App.5th 886, 902.)

Mother argues the juvenile court abused its discretion in its exit orders by failing to provide sufficient information for a family court to determine whether a change in visitation or custody might one day be appropriate. We are not persuaded.

In issuing its exit orders under section 362.4, the juvenile court was required to use Judicial Council Form JV-200. (See § 362.4, subd. (e); Cal. Rules of

16

Court, rule 5.700(b); see *In re Anna T*. (2020) 55 Cal.App.5th 870, 879 [juvenile court erred in failing to file Form JV-200].) The court did just that: its exit orders included a juvenile custody order and final judgment (Form JV-200), a visitation order (Form JV-205), and an attachment to the visitation order (Form JV-206), exactly as prescribed by the Judicial Council.

We have reviewed those forms and conclude the juvenile court properly completed each section. We further conclude the completed forms provide sufficient information for a family court to determine whether a change in visitation or custody might one day be appropriate. The boxes checked on the Form JV-200 custody order and its Child Abduction Prevention Order attachment explain there is a risk Mother will abduct the child, Mother had previously done so, she has a history of not cooperating with Father, she has a criminal record, and she has family or emotional ties to another county, state, or foreign country. The boxes checked on the Form JV-206 attachment explain Mother was granted only supervised visitation because she had not completed or made substantial progress in a domestic violence treatment program for offenders, anger management training, or individual counseling.[3]

This information is sufficiently specific to enable a family court to later determine whether "a significant change in circumstances" ever occurs to warrant changing Mother's visitation or custody rights. We fail to see how the use of the very forms prescribed by the Judicial Council could constitute an abuse of discretion.

---

[3] Mother also argues the exit orders were inaccurate because Mother testified she completed an anger management program, continued her counseling sessions, and completed the domestic violence PEP class. This argument ignores other evidence before the court. The social worker reported Mother had provided no evidence of having completed an anger management program, had not participated in counseling, and had completed only eight out of ten PEP sessions. The juvenile court evidently found the social worker's account more credible than Mother's testimony, and we are in no position to second-guess that credibility determination on appeal.

17

Mother further contends ten hours of weekly supervised visitation is an arbitrary order. We disagree. As the Agency points out, this visitation amount is equal to or more than the amount of visitation Mother has had since the court sustained the petition in March 2019. And given the ongoing concerns that Mother's impulsivity makes her a flight risk, requiring visits to be supervised was not arbitrary.

3. *The Indian Child Welfare Act*

Finally, Mother argues the juvenile court violated the ICWA inquiry and notice requirements. The court found ICWA does not apply for two reasons: (1) the court in the first dependency case had made the same determination, and (2) Father filed a Parental Notification of Indian Status form in the second dependency case attesting he has no Indian ancestry. Mother, however, never filed an ICWA-020 form in the second dependency case, and the Agency did not ask Mother in the second dependency case about whether she had Indian heritage or if she thought I.A. might have Indian ancestry. Mother therefore contends the court improperly found ICWA does not apply without sufficient inquiry or notice.

We review the juvenile court's findings regarding these ICWA issues for substantial evidence. (*In re E.W.* (2009) 170 Cal.App.4th 396, 403-404.) "Deficiencies or errors in an ICWA notice are subject to harmless error review." (*In re Charlotte V.* (2016) 6 Cal.App.5th 51, 57.)

The Agency concedes the juvenile court should have redone the inquiry in the second dependency case to confirm there was no new information about Indian heritage. However, it contends the error was harmless because Mother does not assert she has any new information to indicate ICWA might apply. We agree.

As we have previously recognized, "[e]ven if the juvenile court and SSA failed in their inquiry responsibilities, we cannot disturb the juvenile court's order without a showing [Mother] was prejudiced by the claimed error. [Citation.] And in this case, where there is absolutely no suggestion by [Mother] that [s]he in fact has any Indian

18

heritage, [s]he has failed to demonstrate the requisite prejudice." (*In re N.E.* (2008) 160 Cal.App.4th 766, 769.) "The burden on an appealing parent to make an affirmative representation of Indian heritage is de minimis. In the absence of such a representation, there can be no prejudice and no miscarriage of justice requiring reversal." (*In re Rebecca R*. (2006) 143 Cal.App.4th 1426, 1431.)

In this case, Mother does not assert she actually has or would have disclosed any new information on Indian ancestry if asked. She argues only that she "could have learned" some new information. That argument is speculative at best and provides no basis for reversal.

## DISPOSITION

The August 2020 findings and orders are affirmed.


GOETHALS, J.

WE CONCUR:


MOORE, P. J.


FYBEL, J.


19